FREDERICK WOHLENBERG V. JOHN MELCHERT.

[FILED DECEMBER 16, 1892.]

1. **Bill of Exceptions**: AFFIDAVITS used at the hearing of a motion in the district court, to be available in this court, must be brought into the record by a bill of exceptions.

2. **Trial**: ADMISSION OF INCOMPETENT EVIDENCE: OBJECTIONS: REVIEW. When incompetent or illegal testimony is admitted upon a trial without objection, error cannot be predicated in a reviewing court upon the admission of such testimony.

3. **Review**: NEWLY DISCOVERED EVIDENCE AS GROUND FOR NEW TRIAL: BILL OF EXCEPTIONS. A party is not entitled to re-

view, on appeal or error, the decision of a trial court in denying a new trial upon the ground of newly discovered evidence, unless all the testimony given on the hearing of the motion is set out in a bill of exceptions.

4. **Sufficiency of Evidence:** DAMAGES. *Held,* That the evidence in the case is sufficient to sustain the verdict, and that the damages assessed by the jury are not excessive.

ERROR to the district court for Lancaster county. Tried below before FIELD, J.

*E. P. Holmes,* and *Edwin M. Lamb,* for plaintiff in error.

*Pound & Burr, contra.*

NORVAL, J.

This action was brought in the court below by defendant in error to recover damages for personal injuries alleged to have been sustained by John Melchert, a minor, resulting from kicks given by the plaintiff in error. The jury returned a verdict in favor of the plaintiff below, assessing his damages at the sum of $2,000. Judgment was entered upon the verdict, to reverse which the defendant brings the cause to this court on error.

The first question presented for consideration is raised by the motion filed by defendant in error to strike out of the transcript and record, copies of certain affidavits made by Frederick Wohlenberg and E. L. Holyoke, which were filed in the office of the clerk of the district court, and which, presumably, judging from their character, were used on the hearing of the motion for a new trial. The motion to strike is well taken, for the reason that the affidavits in question were not made a part of the record in the case by bill of exceptions. Affidavits used at the hearing of a motion in the district court, to be available in the supreme court, must be included in the bill of exceptions. This is too well settled to require the citation of cases.

Complaint is made that the verdict is not sustained by

the evidence, and that the damages assessed by the jury are excessive. The record shows that John Melchert, in October, 1882, at the time the alleged injuries were received by him, was residing with his step-father, the plaintiff in error, and was at that time about ten years of age. We quote from the bill of exceptions that portion of the direct testimony of the defendant in error, which describes the nature and character of the injury and how it occurred, as follows:

Q. Where were you when you were injured?

A. In the house.

Q. Who injured you?

A. Fred Wohlenberg.

Q. How did it occur?

A. It was in the morning. The three boys slept upstairs. He called me, and told me to call the boys. I called them, and he said, what are you doing up there, you damned hog? And he kicked me on the side, kicked me down. I cried; my mother came in and he kicked me twice after that.

Q. Where were you kicked?

A. In the dining room of his house.

Q. Where did he kick you each time?

A. On the side and back.

Q. What did he have on his feet?

A. He had boots.

Q. How large were the boots?

A. About number 10.

Q. How hard did he kick?

A. He kicked hard enough to kick me down.

Q. How many times?

A. Three times.

Q. Who were present and saw this?

A. My mother, sister, and brother.

Q. Which brother was it?

A. My half brother, Fred Wohlenberg.

Q. The son of Mr. Wohlenberg?

A. Yes, sir.

Q. Before that time did you ever have any pain or sickness?

A. No, sir; I was healthy.

Q. Can you describe the pain that was occasioned by these kicks?

A. Yes, I can. It is such that I cannot do any work, and whenever I do any work it lays me up. I have pain all the time.

Q. How was it at that time?

A. I don't hardly remember, it has been so long ago. I know it was awful bad.

Q. What did you do, and what did your mother do, if anything, for this injury?

A. We did nothing for a while, and then I went to Dr. Peters, who treated me for my kidneys, but did not do me any good.

Q. What then did you do?

A. I did not do anything until a year and a half ago, when I went to Dr. Hart, who put a plaster of Paris jacket on.

Q. How many of these plaster of Paris jackets did you have?

A. Two.

Q. How long did you wear them?

A. About two months.

Q. Explain what the plaster of Paris jackets are?

A. They fit something like a corset, only closer to the body.

Q. They are cast right on the body?

A. Yes, sir.

Q. Do you know the object and purpose of wearing them?

A. They thought it would strengthen my back and hold that rib in place.

Q. Do you know what part of your body was injured by these kicks?

A. Yes, sir.

Q. Where was it?

A. It was the last floating rib, and the spine.

Q. Did you have any curve in the spine prior to that time?

A. Not that I know of.

Q. Do you know how your spine has been since that time?

A. Yes, sir.

Q. How was it?

A. Curved.

Q. What has been your business since?

A. I worked a long time at the 99-cent store, worked on a farm a while, and for the State Journal Company.

Q. Who did you work for at the 99-cent store?

A. Mr. Shelton.

Q. How long did you work for him?

A. Very nearly two years.

Q. While you worked for him did you suffer pain resulting from your injuries?

A. Yes, sir; I always suffer pain in my side and in my back whenever I do hard work.

Q. How is it at the present time?

A. There is a pain there now, a steady pain; I can hardly explain it.

Q. How is it when you lift any article, especially one of any weight?

A. It hurts me a great deal worse than at other times.

Q. Did you see any other doctor than Dr. Peters?

A. Yes, sir; Drs. Mitchell, Righter, and Woodward.

Q. Did you consult any physician out of this town?

A. Yes; some in Omaha.

Q. Who were they?

A. Dr. MacNamara.

Q. What did you go there for?

A. To have my back straightened by the electric treatment. I was at the hospital.

Q. What objections did he have to your going?

A. He made none that I knew of, because I was not staying there.

Q. Why was that?

A. He drove me away.

Q. When?

A. About a year ago last summer.

Q. What did he drive you away for.

A. We had a fight down there at the house when I had on one of the plaster of Paris jackets. We were playing at throwing ball, my eldest brother and I. Mother called us to supper, and when we got around the corner, he struck me in the face and pounded me all up, when I did nothing; he told me to keep away from the house. That was the 8th day of April; it will be three years.

Q. Three years next April?

A. No; two.

Q. Did you ever talk with your step-father about this pain in your side?

A. I have told the whole family about it.

Q. Have you talked to him about it in the presence of the family?

A. Yes.

Q. What did he ever do in regard to it?

A. He did not do a thing, he said I was always pretending to have a pain, and I done it to get out of work.

Q. What did you tell him?

A. I told him there was a pain there; I did not know where it came from at the time; I did not know what was the matter until I began doctoring.

Q. What did he say to that?

A. He kept on telling me I was lazy, and trying to make expense.

Q. Did you ever receive any injuries to your spine or back, or any of your ribs, at any other time except from those kicks you have spoken of?

A. No, sir; I never have.

Q. What did MacNamara in Omaha do for your back?

A. He told me my back was curved, my spine was curved, and one of the floating ribs was broken, and he gave me electric treatment to draw the pain out.

Q. State how long a time, if any, between the time you received these kicks and the present, that you have been free from pain.

A. I have not been free from pain at all.

Q. Whose farm was it you went to work on?

A. Mr. Hickson's.

Q. When was it you went to work for him?

A. Four years ago.

Q. How long did you work for him?

A. Two months.

Q. Why did you quit?

A. I could not stand the work on account of my back.

Q. What kind of work were you doing?

A. Plowing and cultivating.

Q. When you came in from there where did you go to work?

A. I went to work for Mr. Shelton again.

Q. Did you go to work for the Journal Company at any time?

A. I went to work for the Journal Company after I quit Shelton.

Q. In what department?

A. In the book-binding.

Q. What were you doing?

A. Learning the trade. I was carrying books down to the job room and getting stock in.

Q. What did you quit there for?

A. I could not stand it for the pain in my back and side.

Q. How long did you work for them?

A. About six months.

Q. When was it you ascertained what was the matter with your back?

A. When I first consulted a physician.

Q. When did you first find out what your injury consisted of?

A. About two years ago.

Q. Was that the time you went to Omaha?

A. No, sir; that was when Dr. Dogge here told me about it.

Q. You consulted him, did you?

A. Yes, sir.

Q. With what result?

A. He said that my spine was out of order, out of shape; but I did not doctor with him any.

Q. Who advised you to go to this Omaha concern?

A. My mother.

Q. How is it in your sleep?

A. I have to lie on my right side. I cannot lie on my left at all. I have to lie on my back, or on my right side.

The cross-examination of defendant in error tends to strengthen his testimony given in chief, instead of weakening it. His statement, as to the circumstances of his receiving the injury, is fully corroborated by his mother, Catherine Wohlenberg, his sister, Hannah Melchert, and his half-brother, Fred Wohlenberg. These persons further testified that before receiving the injuries defendant in error's health was good, was never sick, nor did he complain of his side and back to their knowledge; that since he was kicked by plaintiff in error he has been continually complaining of pain in his side and back, and has been unable to stand hard work.

Dr. F. B. Righter testified that he has been a practicing physician and surgeon for twenty-five years, thirteen of them in the city of Lincoln; that before the trial he made

a careful personal examination of the plaintiff, particularly his spine and the lower part of his chest; that he found that at some time there had been a fracture of one of the lower ribs on the left side, and a curvature of the spine to the right, about three-quarters of an inch, opposite such fracture, about an inch and a half from where the rib joins the spinal column; that in his opinion, based on the amount of callous, the rib was broken entirely through; that in a healthy person such curvature is caused only by an injury to the spine; that a curvature might be caused by constitutional diseases, such as scrofula, but in such case there would be apt to be some trace of the disease, and that "this case did not look like that"; that such a curvature is a permanent injury; that in his opinion, based on the proximity of the fracture and curvature, the fact that the curvature is opposite the fractured rib and the convex position of the spine, the fracture of the rib and curvature of the spine were simultaneous; that on account of being thus affected, he has not the strength nor the endurance of a normal person; that the curvature prevents, to some extent, the working of the spinal muscles; that while the fracture does no damage to the rib, it has produced an affection of the nerve on that side, "so there is great soreness around the injury with the result of great irritation of the nerve in the spine and the feeling of sensitiveness at the ends of that nerve."

The plaintiff in error testifies that he did not kick defendant in error at the date claimed, although he admits that he kicked and hit him at other times; admits that his step-son has been injured in the side and back, from which he will never recover, and attributes it to different causes, namely: To sickness when John Melchert was a child about two years old, then to a fall received while skating on the ice, and again to a fight with another boy. The clear preponderance of the testimony is against each of these theories, and establishes that Wohlenberg kicked de-

fendant in error, thereby breaking one of his ribs and permanently injuring his spine; that before receiving the injury he was always hearty and free from pain, but since which time he has constantly suffered with his side and back, and has been, and still is, unable to perform hard work.

Plaintiff in error also introduced upon the trial testimony tending to prove that he was absent from the city on the 15th day of October, 1882, the day named by the defendant in error and his witnesses, on which the injury was inflicted.

Drs. Woodward and Andrews testified, in effect, that they made an examination of Melchert's body, but did not find anything peculiar about his back in any way, did not discover any curvature of the spine, nor observe that any of the ribs were fractured. The proofs show that these medical experts did not make a very critical examination of the body of Melchert. Neither examined the spine nor looked for a fractured rib.

It has been the uniform holding of this court that it will not reverse a judgment on the ground that it is against the evidence, unless the finding of the trial court is clearly wrong or is manifestly against the weight of the testimony. Applying this rule to the case at bar it is obvious that the verdict of the jury should not be disturbed. The testimony of the plaintiff below, and his witness, if true, of which the jury were the sole judges, is ample to sustain the verdict and judgment. The damages are not excessive, but are fully justified by the evidence.

It is urged that the court below erred in allowing the defendant in error to testify that his step-father beat him cruelly about two years before the trial. The record discloses that this testimony went to the jury without objection; hence the error, if any, in admitting it was waived. When incompetent or illegal testimony is admitted upon a trial without objection, error cannot be predicated in the supreme court upon the admission of such testimony.

We are finally asked to reverse the judgment upon the ground of newly discovered evidence. Although it is one of the causes assigned in the motion for a new trial, we are precluded from considering the question, inasmuch as the evidence submitted to the lower court in support of and in resistance of the motion is not before us. A party is not entitled to review in the supreme court the decision of the district court in denying a new trial upon the ground of newly discovered evidence, unless all the testimony given on the hearing of such motion is set out in a bill of exceptions. And this for the purpose of enabling the reviewing court to ascertain whether the moving party has been injured by the ruling. Prejudicial error is never to be presumed, but must be shown by the record. Our conclusion is that no sufficient ground is pointed out for disturbing the verdict, and the judgment is

AFFIRMED.

THE other judges concur.